Good morning, Your Honors. May it please the Court, Doug Dennington for Appellants. I intend to reserve three minutes for rebuttal, and I understand I need to keep track of my own time. I'll do my best. Your Honors, by any metric, the City of LA's eviction moratorium, in this case, was extreme and severe, excluding the various District Court opinions that have reviewed the different eviction moratorium that cropped up during the pandemic. I've yet to find a single published Ninth Circuit, Supreme Court, or any other decision which upheld the regulation in the face of a takings challenge, which forced a private property owner to dedicate its property to public service without some assurance of compensation for that service. That's exactly what the City's eviction moratorium did in this case. We're not alone in that feeling. We know that six members of the Supreme Court felt similarly with respect to the national eviction moratorium in Alabama Association of Realtors. In that case, of course, the Supreme Court blocked further application of the CDC's national eviction ban, and we recognize that Alabama is not dispositive on this case. It was not a takings case. However, it is the one case that the Supreme Court has looked at a pandemic era eviction ban, and if you look at the second part of that decision, Your Honors, you have six members of the Supreme Court who have weighed in heavily on the issues, the physical taking, and the regulatory taking claims that we have asserted in this case in addressing the equities associated with whether or not the district court's injunction should continue to be stayed. The court first questioned, if not criticized, the CDC for singling out by preventing landlords from evicting their tenants who have breached Mona Lisa's key language in our view. You have then shut it off. One of the most fundamental rights of property ownership, which is the right to exclude, and they cited, of course, the Supreme Court's lodestar case for physical takings, Moana versus Manhattan. Of course, the district court in this case was not persuaded by that language and was not persuaded by the equities discussion and felt that E versus S can be the controls, the outcome of our physical takings claim, and we strongly disagree that E controls. First, E at its core was a rent control device. Rent control has been around since at least 1921 when Justice Holmes delivered the opinion and bought the Hirsch, which approved a Washington, D.C. regulation that had a moratorium that forbade increases in rents. At that time in Washington, D.C., of course, rent was coming back from the war, World War I. There was a huge shortage of housing and this huge increase in demand for housing, and they said, we're going to regulate rents. We're going to cap the rent, but you still have to pay that rent during the moratorium, but this didn't increase it based on this huge increase in demand. And if the landlord, even in that case, said, you know what, that rent is not fair, and of course, whenever you have a rent control regime, you have a constitutional obligation to assure a fair return to the landlord, a in this case. The Supreme Court in Yee did address an eviction argument because the rent control ordinance worked with the state and statute to prevent eviction for no fault reasons and made eviction even if you changed the use of the property extremely difficult, and the Supreme Court wasn't moved by those arguments. Yes. Well, what I believe the park owner in Yee did was they tried to use the more recent Loretta decision to undo a rent control regime that lowered rents, and there were two laws in place. There was California's mobile home residency law, as well as the city of Escondido's local law, and then together they said that, you know, this isn't a physical taking, even though you have to pay this reduced rent under this rental regime, it's not a physical taking because the tenants were invited by the, or I guess the mobile home owners are the tenants in that scenario, were invited by the park owner in the first place. And we've seen that with district court opinions on, that have weighed in on this invitation language that's in Yee. Well, that didn't impress upon this panel, except I believe they looked at Yee, that invitation language in Yee very superficially. Invitations, like any invitation, an invitation is contingent on the purpose for the entry. When I invite friends over for a dinner party, I don't expect them to come in with their suitcases and stay for the summer. So, the invitation is not absolute and circled by the 20. The tenants are in right to their lease. There's no longer a landlord-tenant relationship. The tenant has naked possession of the property, but the relationship is gone. The landlord has the right to the possession at that point. That is the distinction we're trying to make on this invitation. So, yes, at that point, the tenant is a tenant and an invitee. That tenant can later become, wears out its welcome, for lack of a better term, and becomes a stranger to the relationship. And I don't think any of these courts, district court opinions, have looked at that. And secondly. I don't see a case saying that. What do you think is the best case? Because the Supreme Court seems to say you can adjust the relationship between landlord and tenant, even if it's fairly draconian. It's still not a government interloper with a license, or whatever the language is they use. Our position, Your Honor, and it's a good question. Our position, Your Honor, is that the invitation is contingent, and they do become an interloper with a license. And what's the case? That's where it's at, your best case. The best case, I would say, is the second portion of the Alabama Association of Landlords, just because it's directly on point with respect to the second part of the opinion, dealing with an eviction moratorium. But, of course, in a more general sense, it's inappropriate. Which is... They're a positive interloper. They have the opportunity to buy the property. That's absolutely correct. But the invitation, again, is contingent. Like all things, all invitations are contingent. It's not absolute. There's nothing in taking so it's absolute. Well, it's actually... Well, if you read the district court opinions, you see what this invitation is. And so, yes, they are an invitee originally. That doesn't mean they get to stay forever. They get to stay as long as they're performing in accordance with the terms of their lease. Now, what happens if a person says he's got the COVID-19 and he doesn't have it anymore? Can you raise that? Or is that a forever bar? A person who has COVID? I guess I'm not understanding your question, Judge Summer. Does that have to do with someone who's gotten sick or the family's gotten sick? Yes. The moratorium itself impacts tenants who... Well, applies to tenants who are impacted by COVID. Certainly. But in the city's eviction moratorium, there's no way for the landlord to even contest that determination. And, in fact, the city's eviction moratorium doesn't even require the tenant to give notice of that. And as we've put in our briefs, the landlord is stuck with guessing as to whether or not this tenant is going to assert a COVID-related reason. I can tell you if we were allowed to go through with the litigation in this case, that those issues would be ferried out on almost a tenant-by-tenant basis. But we weren't allowed to do that. I don't know if that answers your question. Can I ask a question? Did you make a request to amend your complaint before it was dismissed? No. No? No. In fact, Judge Bergerson gave us leave to amend. You didn't take it? We did not take that. Yeah. Because we're dealing with, at least on the fiscal taking plan, we're dealing with the application of the eviction moratorium. But I'm going to try to take you through what you can get to now. I'm going to turn to winding down, so I'll try to hit those issues quickly. We take issue with the courts' requirement that we specifically allege at the pleading stage a demonizing value. First of all, the three factors that are considered under Planned Central are just factors to be considered. They aren't relevance for a cause of action like you would have for negligence or breach of contract. They're just considerations in this ad hoc world that we live in in Planned Central. And the magnitude of the regulation, I know there's Connelly Cove and the earlier decision, MHC Financing, I believe, which talks about, you know, in the judge's ultimate determination of whether there's a regulatory taking, one must consider, you know, the diminution in value to look at the magnitude of the impact. We strongly disagree that that should rather be a pleading requirement, as we set forth in our papers. It is our belief that we did allege, well, we did allege a severe diminution in value of the property. I saw the $20 million loss. That's correct. I didn't see anything with the new mortgage denominator like Keystone by doing this in those cases required. Well, Keystone was a predecessor to a total regulatory taking claim, or a total taking claim. It was analyzed as a Planned Central claim. That was the case that Justice Scalia cited in Lucas as establishing this new categorical total Lucas taking. That should not be a pleading requirement for a number of reasons, but number one is we were filing this complaint. Well, we filed the complaint. Well, the initial requirement was still in place. So any valuation we had, a diminution of value as of the term, that appears when I continue in a denominator, I mean spending a career doing valuations in state court, that is a complex valuation, and it would like to be done in an income approach, in a comparable sales approach. And so you have to look at the income analysis to do this comparison. Whatever valuation we could have come up with at the time we allowed you, even at the time the court ruled, would have changed the next month. And these are expensive valuations, and we believe it's completely unfair to require the plaintiff to go through what is really the nuts and bolts of Planned Central litigation, the valuation at the pleading stage. Economy Cove, of course, came to the Ninth Circuit after a jury trial, second-finger regulatory taking, and after an early motion for judgment as a matter of law, after this jury verdict. So that does not stand for the proposition that it has to be claimed. I will reserve my one minute and ten seconds for rebuttal here on this, and maybe I'll talk a little bit about the intervention issue. Okay, we'll hear from the other side. Good morning. I'm pleased to report Jonathan Eisenman for the City of Los Angeles. I'd like to pick up on something that I think was coming from Judge Seiler's question about when this moratorium would have affected a landlord. I don't think that my friend has yet to explain when exactly it is he believes that the city engaged in a per se taking of his client's property. The city passed an ordinance that laid out a form of defense for tenants to invoke if someone attempted to evict them, like any other defense to a lawful detainer. And the pleadings in this case don't even allege that the landlord's ever tried to evict any of these folks. There's an argument in the reply brief in opposition to us pointing this out in our answer brief that there were never any attempts to evict. The law prohibits an owner from endeavoring to evict or evict a residential tenant for nonpayment of rent, and then a landlord is exposed to damages if they do, if they violate that requirement. So I don't understand why that isn't an independent prohibition on what a landlord can do. So two things in response to that. One, it's a prohibition, the teeth of which are found in the affirmative defense. A landlord who's following the law would say, I may not endeavor to evict or evict a tenant for nonpayment of rent if the tenant is unable to pay rent due to circumstances related to the pandemic. So that's just a flat prohibition on a certain type of action. So accepting that a landlord then says, I'm just not going to evict any of those tenants. You still have the question of who are those tenants? So my friend says, well, it's impossible for us to find out because we're afraid to litigate these claims. But the ordinance itself gives a landlord a good faith. First of all, the endeavor to evict language is defined in the ordinance as moving in bad faith to evict someone. The ordinance itself requires a tenant to provide the landlord 15 days notice and an opportunity to cure if they believe the landlord is intending to evict them in bad faith for COVID-19-related reasons. So really before the ordinance affects the landlord's ability actually to evict this person, you have to have an eviction based on – it has to be integrated with eviction that would otherwise – I see that as you can't evict. And the complaint alleges that the tenants were relying on that or took advantage of this moratorium. It's vague, but clearly they could tell the landlord, don't even think about evicting because I have COVID-related issues. And then under the ordinance, the landlord would move at his peril. I don't think it's the landlord's peril. The landlord has – if the tenant says, I have COVID-19-related reasons, they could accept the tenant's representation of that and not proceed. Or if they think the tenant is acting in bad faith, they could proceed with the unlawful detention. And they're at risk of this private right of action and these simple penalties of $10,000 for violation, et cetera. So I just don't see how that means that the landlord has to move to evict first. I guess what I would say in response to that is that you can imagine a situation outside the COVID-19 context where the city just said, we think we're going to make it unlawful for a landlord to evict a tenant in bad faith. You have to be able to show that the tenant hasn't made their payments timely. And the landlord comes to court and says, well, gee, I'm concerned that if I actually try to evict a tenant, they're going to say the landlord doesn't have evidence that I defaulted on my payments and I'm going to sue the landlord. So we're just not going to try to evict anyone. And then they're going to say the city owes us compensation on a per se basis for every person we never even tried to evict, which is effectively what they're saying here. There's no allegation they attempted to evict any of these folks. They're just saying that because we were afraid we'd be accused of making an eviction in bad faith. We're now owed compensation on a per se basis. And I'm not aware of any case that says the interim effect of a law entitles you to say that your property has been taken from you on a per se basis. So bad faith would mean in that context in violation of legal requirements. Is that what you're saying? Or are you saying something else? It could be in violation of legal requirements. You could fix it to any sort of thing. Any sort of thing as a wrongful eviction claim as it is now. You could say in a circumstance in which a tenant would have a wrongful eviction claim against a landlord. So if the ordinance said a landlord can't evict a owner for having pets, then the landlord would have to try to bring an eviction action before they could say that that rule was binding on them. Is that what you're saying? I don't understand. I think before the landlord could say you've taken my property from me, pay me compensation, you'd actually have to try to evict the tenant. So if the landlord knew that the tenant had pets and went ahead and brought it, he would have to bring an eviction action anyway. Is that what you're saying? Especially if the restriction on the pets is framed as an affirmative defense. Well, it's not. It's a flat prohibition. So if the landlord knew there was a pet there and then said, I'm not going to evict you because there's a pet there, I'm afraid, and this ordinance is being enforced against me, then maybe they could point to a tenant and say that's what stopped me from evicting that tenant. You could say, you might move on to the next part of this, which is on the merits as they're taking here. But I don't think you can just. That's what the complaint says, that the tenants took advantage of that. My reading of the complaint was that the tenants took advantage of the rule in the sense that they defrauded, and my friend's client was afraid to evict them altogether because they were concerned about running into the teeth of this private enforcement action. I think your theory is that they're bringing in an attempt for an advisory opinion, that they don't have standing. I think what I'm saying is I am saying the claim for a taking is premature. If your claim is they've taken it before, they don't have standing, they don't have discreet injury, but unless they've sought the eviction and been frustrated by the affirmative defense. I think that's right because if the claim is you've taken a leasehold from me, then answer the question at what point you've taken a leasehold. I don't think the answer can be, well, we were afraid to evict people, therefore you've taken a leasehold for all these months. You would see that as affecting a facial challenge to the statute. They've said in their papers that they're affecting it as a supply challenge to the statute, but if it were a facial challenge to the statute, I think you'd have to show when the statute was enacted, it automatically took some value from their, took their burden on a per se basis for their per se taking, so they not even took some value from the property. If we move down to the merits, it's interesting to hear my friend continue to talk about the Supreme Court's opinion and Alabama Association of Realtors and see if it has any application to this case. The fact is that if you wanted to read Pete Leaves, there's an opinion from this court recognizing it's unpublished, but it's one in the case that my friend himself said was related to this. In El Papel, it's a panel judged by Judge Forrest and District Judge Gordon that found that he applied to Seattle's moratorium, which is in some sense more onerous than the Los Angeles moratorium. Well, the Supreme Court has given some pretty strong hints that they don't think he, that they're willing to take another look at he. So, I think there's two ways to respond to that. One is the petitioners in El Papel, or the landlords in El Papel petitioned for certiorari in that case, and it was denied without even calling for a response. I know that my friend and his client, Court Grant and Amicus briefed supporting certiorari in that case, so you could read those tea leaves to say, in fact, that the court is not particularly interested in these cases. If you look, I suppose, at Justice Thomas's opinion for himself in the Pinehurst 74 LLC case, if that's what you were referring to, Judge Okuda, it expresses his interest in a case where there is some clearly framed taking. In that case, I think the facts are more clearly framed than in this one. You have landlords speaking of specific tenants that were causing the specific issues that they deemed to be takings. In that case, under New York's more onerous rent control provisions, and still the Supreme Court denies certiorari. And not only in that Pinehurst case, but in a slew of other cases that alleged that provisions that prevented landlords from evicting tenants who were deemed to be in default amounted to per se takings. Does this ordinance have any kind of expiration date? It's already expired. It's expired already, and in fact, my office looked this week to see if the city had ever enforced it against anyone, and the answer to that was no. So I think on the merits, he has the applicable authority here. It's been filed by every court except for the panel in Heights Apartments. I think Judge Colleton's dissent there has been proven more persuasive than the panel's opinion. No one has followed the panel's opinion. Two courts, at least, have followed Judge Colleton's dissent. And again, on this court, there is both the unpublished opinion in El Papel and another unpublished opinion for which we provided a 28-day letter in Bowles. Judge Seiler, your colleague, Judge Bonds, was sitting as a visitor on that panel. So I'm not aware, and my friend cited no authority for the case that this would amount to per se taking. We conceded in our brief that you might try to advance a set of regulatory takings theory. And it is important to point out here that this isn't leaving landlords with no recourse if a government imposes some draconian landlord-tenant regime on them. They could advance a regulatory takings theory. My friend refused simply to give a basis to show that he suffered a severe diminution in value here. He continues to refuse it as not required, even though the Supreme Court itself in Moore v. Wisconsin continued to require that. He was offered leave to amend, to allege it. He refused to take the leave in order to rush to this court. And he refused to request it in his opening brief and in his reply brief. So I think to the extent that there is some remedy for his professed injury, he has forfeited and waived it and done so willingly, voluntarily, and for the purpose of making an argument that that shouldn't be the law. Unless the panel has further questions, Ms. Joseph, I believe, will take the remainder of the time. Thank you. Good morning. May it please the Court. Holly Joseph on behalf of the interveners, appellees, Peace Action, SAGE, and CES. I want to start where my friend with the city left off regarding appellant's regulatory takings claim. There's a binding precedent that this court issued in 2015, the Rancho de Calistoga case that we cited in our papers. Under that case, we don't even have to look at Colony Cove and that posture. Under Rancho de Calistoga, this court affirmed the dismissal of a regulatory takings claim where the plaintiff actually did plead the requisite elements to show a diminution in value, but the amount that the plaintiff there alleged was only 28.5%. And that's clearly insufficient under the Supreme Court and this court's precedence. Appellant's complaint is far more deficient than in Rancho de Calistoga. It doesn't plead the facts necessary to make the value comparison, as Judge Kudo pointed out. It can't be the case that where a plaintiff is up front about trying to meet the threshold for a takings claim and the economic impact, but fails to meet the diminution in value threshold, that that case gets dismissed, but that plaintiffs here get to proceed because they chose not to even allege the economic impact. These are fact-specific questions, but they are routinely analyzed at the pleading stage, not only in Rancho de Calistoga, but in several other unpublished decisions from this court. We cited some in our brief, and while not in our brief, I did want to point, Your Honor, Judge Kudo, to the Dale Woodholding case from 2021. You were on that panel where the court affirmed the dismissal of a regulatory takings claim, where the plaintiff failed to allege that the City of Broadmoor Park's action resulted in a constitutionally significant diminution in the property's value. So dismissal is routine on these facts, and it should be followed here. I do want to point to the... I'm sorry, one moment, Your Honor. I also want to point to the character of the government regulation element of the Penn Central analysis. I think many courts, including this court in the Agla decision, which analyzed a challenge on contracts clause grounds to the city's eviction moratorium, in that case, the court recognized the overwhelming impact and public health crisis caused by the pandemic, and I think it is beyond dispute here that that factor in this case weighs heavily against regulatory taking. Now, I do want to turn very briefly to the second component of appellant's appeal, which regards our, I'm sorry, the district court's grant of intervention as of late or in the alternative permissively to my clients. I didn't see in your brief, I didn't see any argument that was different than appellee's argument, so why isn't there representation? Certainly, Your Honor. First, we did address the second and third prongs of the Penn Central analysis. I don't believe the city devoted time in its brief for that. But more importantly, under this court's precedence, we are not required to identify, especially at the early stage at which intervention was granted, we are not required to identify a clear divergence in legal positions or that there will be an adverse legal position. And I would point, Your Honors, to the court's 2001 decision in the Berg case. It's Southwest Center for Biological Diversity versus Berg. And in that case, the court expressly said that where an intervener, where existing parties may inadequately represent an intervener's interests, particularly where, as here, our interests are far narrower than the broad range of considerations that the city had to consider in crafting, enacting, and defending the ordinances which have now expired, we think that that's more than sufficient, especially given the stage. And I see my time has expired, but if I may just wrap up. Even if this court were to have some questions about adequacy of representation, there was certainly no abuse of discretion in the district court's alternative grant of permissive intervention. And finally, because the judgment on the merits of the taking of claims should be affirmed, the court may not even reach the question regarding intervention and may dismiss that portion of the appeal as moot. Thank you. We have some time for rebuttal. Very little, it looks like. Just real briefly, with respect to the amicus brief that we filed in El Capel and counsel saying the Supreme Court's not interested in it, it's not. The memorandum opinion is not published. There's not a split in the circuits yet. And, you know, we didn't have any, you know, great expectation that the Supreme Court would review grant sociality in connection with an unpublished memorandum disposition. So regardless of the outcome here, we certainly would hope that this decision is published. Concerning the regulatory taking issue in Recyc-Hodera versus El Capel, Hodera was a case that deals with no, it was a potential regulatory taking. It dealt with, it specifically found there was no economic impact there. There was no interference with distinct investment backed expectations. However, the character of the regulation, the character of the regulation was so extreme that the other case actors were just wiped out. We believe the character of this regulation, the Supreme Court and Alabama Association has unworthy interest in it. And when you talk about the character of the regulation, you're looking at two things. Justice Brennan in Penn Central talked about does it smell like, taste like, look like a physical taking. Other cases, Leno talked about are you single enough, one segment of the population to bear a burden that's enjoyed for the service of the entire population. The Supreme Court addressed that in that equities discussion in Alabama Association Association of Realtors. With that, let me sit back on the papers on our intervention arguments. Thank you. Thank you. In the case of GHP Management Corporation for Houston City, Los Angeles has submitted
judges: Siler, BEA, IKUTA